Casey, C. J.,
delivered the opinion of the court:
These parties claim the net proceeds of 108 bales of cotton, taken from them in September, 1864, by the military authorities of the Unitd States, at Atlanta, Georgia. It is claimed this cotton was turned over to the agents of the Treasury Department, and by them sold, and the money paid into the treasury of the United States. These proceeds, it is averred, amount to the sum of $360 27 per bale, and the claimants insist their proceeds should be awarded to them under the third section of the captured and abandoned property act, approved March 12, 1863.
The claimants have proved very satisfactorily their ownership of the *395 property; and its seizure is proved by producing tbe certificate and receipt, given at the time, to the claimants by the military officer who made the capture. It is proved that it was forwarded to an officer at Nashville, and he in turn shipped it to the agent of the Treasury Department at Cincinnati, who returns that he sold whatever property and all of it that was so forwarded to him, and has paid into the treasury the net proceeds. The third section of the act of March 12,1863, undoubtedly contemplated that a separate and distinct account of the seizure, sale, and amount of proceeds, with the specific costs and charges on each lot, should b6 kept by the persons charged with the seizure and disposal of such property. It was either found impracticable to do so, or has been almost wholly neglected, by the persons charged with the execution of this law. The seizures, sales, charges, expenses, and proceeds have been so intermingled and confounded, and the accounts so badly kept, and returns so imperfectly made, that an approximation to accuracy is all that is now attainable from the imperfect data given. After the shipment of the cotton from Atlanta, its identity, from the causes enumerated, is completely lost; and we can only arrive at a conclusion as to the amount by taking the average of the sales and proceeds of a period covered by these operations. From all the facts proved we are satisfied that the claimants were the bona fide owners of the property; that it was seized and sold, and that the money it brought is now in possession of the United States. After making full allowance for all losses, charges, and expenses, we are satisfied that the net proceeds of the cotton taken from these claimants amounted to the sum heretofore named per bale.
The only objection urged with any degree of earnestness in this case was the want of proof that the claimants had never given aid or comfort to the rebellion. Upon this point three things are alleged as showing that they gave aid or comfort to the rebellion:
1. By engaging in schemes to break the blockade of the ports of the insurrectionary States.
2. By attaching themselves as members to a “home guard,” a military company formed to aid the confederacy.
3. By contributing to the equipment of a military company called the “Jackson Guards,” which afterwards went into the service of the rebel government.
We have carefully considered the objection, and examined all the proofs in the cause, but have not been able upon them to sustain the objections urged by the learned deputy solicitor.
1. The proofs completely overthrow and explain any expressions *396 used by the claimants, or either of them, in reference to blockade stock. This it was shown related to an organization of parties, and mutualcontribution, by which they sent a person north to procure permission to take cotton and other products through the lines or blockade, and to take in certain necessaries and medicines for which many Union people were suffering. The project failed and was abandoned. But the proofs show that a breach of the blockade was not within the contemplation of the claimants, or any person associated with them.
2. Their connection with the “home guard,” we are satisfied, was with a view of evading conscription and service in the rebel army. The object was more especially to secure life and property at home, and the peace and quiet of the city or community in which they lived, than to be used as a force in aid of the rebellion. It was resorted to very extensively in the south by Union men to avoid being compelled to bear arms against the country. But here, in fact, though liable to be called upon, they were never called into service, and therefore, in that connection, never did any act in aid of the rebellion against the United States.
3. In the commencement of the war, when the popular excitement was at its height, and when all persons in southern cities suspected of being favorable to the national cause were in constant, imminent peril of life and property, they yielded to their fears so far as to contribute $10 to the equipment of a company composed of fellow-irishmen principally. This company afterwards went into the rebel service. That these claimants, as well as every other person residing in that community suspected of loyalty to the United States, was in great peril, we have no doubt; that their apprehensions of danger were well founded the evidence, as well as the general history of the country, prove. Many were compelled to flee to the mountains and hide themselves “in dens and caves of the earth ” to escape the frenzy and barbarity of those who were bent upon destroying the government and all who adhered to it. The conduct of men and the motives that influenced them, under such circumstances, are not to be explained and interpreted in the light of peace and the presence of the protecting power of the government, but as they stood exposed and affected by the power and presence of a usurping government, backed by the excited piassions and lawless conduct of a frenzied populace.
Making due allowance for the weakness of our common humanity— its fears and its frailties — and reading the whole conduct of these claimants in that light, we think the evidence shows that neither of *397 these parties ever gave any voluntary aid or comfort to the rebellion. Throughout the whole period of the war they were doubtless anxious for the success of the national cause, and opposed to the rebellion; they threw the weight of their influence and opinions in that direction in all proper ways, and whenever it was safe and practicable. It was, of course, but little that the small handful of Union men found in any community in the insurrectionary States could do. Suspected, watched, and often persecuted, they lived in perpetual fear, and acted under constant constraint. And their conduct is to be judged of according to the temper and circumstances of the times in which they lived and moved. Looking to these, in connection with the undoubted general character of these claimants for loyalty, we have no difficulty in saying that they have proved to our satisfaction that they have never given any aid or comfort to the rebellion within the meaning of the act of March 12, 1863.
We therefore find in favor of the claimants for 108 bales of cotton, the net proceeds of which amounted to the sum of $360 25 per bale, amounting in the whole to the sum of $38,909 16, and for this sum an award is to be entered in their favor in the usual form.